MARTIN ANDERSON dba PAGO PLAZA, Plaintiff

v.

SINAGEGE R.M. UTU ENTERPRISES and PAT REID
dba PACIFIC EQUIPMENT LEASING AND
EARTH MOVING, Defendants

High Court of American Samoa
Trial Division

CA No. 7-88

October 12, 1988

Before REES, Chief Justice, TAUANU'U, Chief Associate Judge, and AFUOLA, Associate Judge.

Counsel: For Plaintiff, Roy J.D. Hall, Jr.
For Defendant Reid, Frank Swett
For Defendant Utu, Edwin Gurr

We find the facts to be as follows:

1) On June 19, 1987, plaintiff entered into an agreement with defendants for the lease of a crane belonging to plaintiff. The crane was to be used by defendants on a construction project on the island of Ta'u.

2) The lease provided that defendants would pay plaintiff $65 per hour for a minimum of 50 hours per week for 8 weeks, or a total of $26,000, "payable at time Lessee is paid on A.S.G. Contract No. 554120."

3) The lease also provided that plaintiff would supply an operator for the crane.

4) The lease further provided, inter alia, that defendants were to provide fuel for the crane; marine insurance during its transportation to Ta'u; a mechanic "to perform daily routine and minor mechanical repairs" (emphasis in the original); and accommodation for a mechanic to be provided by plaintiff in the event of a major breakdown. Defendants were also to pay for return transportation of the crane to Tutuila.

5) Defendants chartered the Talimana'o to take the crane to Ta'u. It did not arrive until June 30, eleven days after the beginning of the lease period. (Defendant Reid testified that the delay was in order for plaintiffs to repair the crane. Defendants presented no evidence, however, that they had arranged for earlier transportation to Ta'u or that such arrangements were frustrated by plaintiff's repairs. The parties seem to have contemplated a brief delay in the arrival of the crane, since the lease term is specified as June 19 to August 19 "or a minimum of 50 hours per week for 8 weeks." Eight weeks is 56 days; the lease term is 62 days. We assume that the parties expected the period during which the crane would actually be operated to begin on or about June 25 and to end on or about August 19.)

6) From the beginning the crane had some mechanical problems, principally having to do with a hydraulic fluid leak. This resulted in some "down time" and in plaintiff having to send a mechanic on several occasions.

7) Plaintiff supplied an operator for the crane as required by the lease, but he was unable or unwilling to work for the fifty hours per week contemplated by the contract. Some weeks he worked thirty or forty hours, some weeks hardly at all. By mutual agreement, defendants eventually began using one of their own employees as an operator.

8) On or about August 5 the crane became inoperative and remained so for about five days (Thursday through Monday). Defendants say this was because it completely broke down due to the hydraulic fluid problem; plaintiff says it was because defendants were unable to obtain fuel during this period. We find that the evidence on this point preponderates in favor of plaintiff's version. It does appear, however, that one day of this inactivity was due to necessary repairs on a faulty switch.

9) As a combined result of the crane's late arrival, the mechanical problems, the unavailability of the operator, and the fuel shortage, the crane was used for only 255.5 hours between June 30 and August 18.

10) On August 18, 1987, plaintiff's manager James McGuire met with the defendants and agreed

141

that the lease would be continued "on a month to month basis beginning August 19th, 1987."

11) Between August 19 and September 17 defendants used the crane for 191.5 hours. (Defendants' recapitulation of the hours contains an apparent error, listing the period "8/24-8-29" twice. We have used the larger of the two figures listed for this period.)

12) At the August 18 meeting defendants also verbally agreed to rent a backhoe from plaintiff for $3800 per month, retroactive to August 1, 1987.

13) On August 31, 1987, defendants made a partial payment of $9000. It was the only payment they ever made.

14) On September 10, 1987, plaintiff's manager McGuire wrote a letter to the defendants memorializing the August 18 agreements, thanking defendants for the August 31 payment, and adding that plaintiff "look[ed] forward to assisting [defendants] on your present and future joint ventures in the Manu'a Islands."

15) On September 17, 1987, McGuire went to defendants' work site in Ta'u and seized the equipment. McGuire later wrote a letter saying that the repossession was for non-payment of rent.

16) The crane was then used by plaintiff on some other construction projects in Ta'u.

17) On or about October 18, 1987, plaintiff's mechanic traveled to Ta'u to do $650 worth of work on the crane. Much of this work involved rust damage.

18) On or about December 11, 1987, plaintiff's mechanic again traveled to Ta'u and estimated that it would cost $5000 to put the crane back in working condition. He assessed the cause of the damage as rust due to neglect in the care and storage of the crane.

19) As of the date of trial defendants had been paid $74,254.95 of the total contract amount of $164,160 on Contract No. 554120. $56,907.55 of this amount was paid prior to December 22, 1987. We have no evidence of how much, if any, had been

142

paid prior to the seizure of the crane on September 18, 1988.

From these facts we draw the following conclusions:

1) The evidence preponderates against the conclusion that the defendants were in default on September 17 when plaintiff seized the crane.

The rent was "payable at time Lessee is paid on A.S.G. Contract No. 554120." The most obvious reading of this provision is that the rent was due when defendants were paid in full. This had clearly not happened by September 17. Even if we read the provision as requiring periodic payments corresponding to the payments received by defendants from the government, the partial payment of $9000 on August 31 would satisfy this requirement. We have no evidence of how much defendants had been paid by the government at this time, but we estimate (from the evidence concerning delays in completion of the work, and from the fact that only $56,907 had been paid by December) that if any payments had been received they must not have amounted to more than about $30,000. In the absence of any explicit understanding between the parties, and in light of the other expenses defendants would have been expected to meet as they received payments on the contract, we cannot conclude that the payment of $9000 toward equipment rental was unreasonably low.

It appears, moreover, that plaintiff's manager was perfectly happy with defendants' performance as of September 10. He thanked them for their August 31 payment. He reiterated plaintiff's intention to keep the arrangement going on a month to month basis. He added that plaintiff was looking forward to doing even more business with defendants. This is hardly the sort of letter one writes seven days before repossession.

On the contrary, it seems quite clear that something happened between September 10 and September 17 to change plaintiff's mind about the attractiveness of doing business with the defendants. The evidence yields no clue to what this might have been, except possibly the fact that plaintiff soon put the equipment to use on another project in Ta'u. Whatever plaintiff's motives in terminating the contract, however, it did not

sustain its burden of proving default by defendants.

2) With regard to most of the items in controversy, however, it does not matter whether defendant was in default on September 17. The monthly extension of the contract was to expire on September 19, and plaintiff was under no obligation to renew it for another month. Plaintiff had the right to repossess the equipment about 24 hours later than it actually did, and defendants have not shown that they could have completed their contract if they had had the crane for one more day.

3) If plaintiff had supplied defendants with a working crane and an operator for at least 50 hours per week between June 19 and August 19, defendants would owe $26,000 for this period regardless of whether other problems prevented them from using the crane for that many hours. Defendants cannot, however, be required to pay for 400 hours insofar as they were prevented from using the crane for that many hours due to plaintiff's failure to perform its obligations under the contract.

To the extent that the shortfall was due to the mechanical failure of the crane or to the unavailability of plaintiff's operator, the loss should fall on plaintiff; to the extent it was caused by defendants' inability to procure fuel or to charter the Talimana'o prior to June 30, the loss should fall on defendants. Based on the number of hours the crane was actually used between June 30 and August 19, we conclude that defendants could have used it for an additional 24 hours if it had arrived by June 25, and for another 16 hours if they had not been without fuel for two working days. (These estimates are partly a function of plaintiff's operator's unwillingness or inability to work long hours or on weekends.) Accordingly, defendants are accountable for 295.5 hours during this period, for a total rental of $19,207.50.

3) For the rental of the crane between August 19 and September 17, defendants are accountable for 191.5 hours for a total rental of $12,447.50. (They might have used it for the contemplated 200 hours had it not been for plaintiff's decision to terminate the lease.)

4) Defendants owe $5700 for rental of the backhoe from August 1 to September 17.

5) Defendants also agreed to be responsible for the return transportation of the crane to Tutuila. Defendants might be absolved of this obligation if they had proven at trial that they were substantially damaged by plaintiff's decision to terminate the lease a day early, or that plaintiff's subsequent use of the crane in Ta'u was more than an attempt to mitigate its perceived damages. Since the evidence before us is insufficient to sustain either of these conclusions, we hold that defendants owe $1400 for the return of the crane to Tutuila.

6) Plaintiff also requests reimbursement for various repairs to the equipment. The evidence, however, is to the effect that defendants complied with their obligation to provide a mechanic to deal with minor repairs. All other repairs were the explicit responsibility of plaintiff.

Nor has the plaintiff sustained its burden of proving that the rust damage was due to the negligence of plaintiff. The first evidence of such damage was on October 28, a month after the crane had been repossessed by plaintiff. Substantial further damage seems to have occurred between October and December.

7) Plaintiff also seeks reimbursement for expenses incident to the repossession and for subsequent air fares to Ta'u. Since defendants have not been proven to have been in default, these expenses are not recoverable.

8) Defendants also seek a number of deductions from the amount they owe. The only such deduction sustained by the evidence is $1068 for 178 hours of wages to defendants' crane operator. This payment was made necessary by the unavailability of the operator plaintiff was obliged to provide.

9) Defendants are entitled to credit for the $9000 they paid on August 31, 1987.

ORDER

Judgment will enter in favor of plaintiff and against defendants, jointly and severally, in the amount of $28,687.

It is so ordered.